UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| C & L Diners, LLC[1] | : | Case No. 22:50599 |
| Debtors | : | Subchapter V |
| | : | Joint Administration Requested |

**DECLARATION OF HERMAN LI IN SUPPORT OF
DEBTORS' EMERGENCY FIRST DAY MOTIONS**

I, Herman Li, declare as follows:

1. I have personal knowledge of the matters set forth herein, and, if called upon as a witness to testify thereto, I could and would competently so testify to those matters, except as to those matters expressly stated to be made on information and belief.

2. I am a representative of C & L Diners, LLC, C & L Hartford, LLC and Pacific Restaurants, LLC (collectively, the "Debtors").

A. **Background of the Debtors, Conquest, and the Chapter 5 Filings**

3. C & L Diners, LLC and C & L Hartford, LLC are Delaware limited liability companies with their principal places of business located in Connecticut. Pacific Restaurants, LLC is registered in Rhode Island and is operating in Rhode Island. Currently C & L Diners has operating locations in Danbury, Conn, Holyoke Mass, and Southington, Conn. Over the past 6 months it has closed locations in West haven, Conn, Enfield, Mass, Chicopee, Mass and Wethersfield, Conn. Pacific operates store in Warwick, R. I and C & L Hartford operates a store in Hartford, Conn.

---

[1] C & L Hartford, LLC (#22-50601) and Pacific Restaurants, LLC (#22-50600) have moved for their bankruptcy cases to be jointly administered with C & L Diners, LLC (#22-50599).

{00375215-12}   1

4. The managing member of the Debtors is now Herman Li ("Li"). Danny Chu was a manager, however, he died in 2022. His estate is not a manager but is an interest holder.

5. The Debtors collectively own and operate five (5) Denny's restaurants throughout New England ("Franchise Restaurants") pursuant to various franchise and related agreements (the "Franchise Documents") with Denny's Corporation, a publicly traded entity under the symbol Denn. Each location has separate Franchise Documents; however, all Franchise Documents are cross defaulted to other Franchise Documents where Li is the managing member. Li is the managing manager of other Denny's restaurants that are not filing. The entities that are not filing are C & L Johnston, LLC; C & L N.S., LLC; C & L Springfield, LLC; C & L WB, LLC; C & L Cranston, LLC; C & L Wallingford, LLC; C & L Fall River, LLC; and C & L AM, LLC. The entities that are not filing are single store entities where the stores are either closed and no reorganization is possible or, at this point, do not have financial issues requiring the need for Bankruptcy Court relief.

6. C & L Diners, LLC has eighty-three (83) employees, C & L Hartford, LLC has thirty-four (34) employees and Pacific Restaurants, LLC has twenty-one (21) employees.

7. The Debtors' primary source of cash is derived from the day-to-day business operations of the Franchise Restaurants. In order for business operations to continue uninterrupted and to generate funds in support of the overall reorganization strategy, the Debtors must be able to continue to use the cash generated daily from such business.

8. A lien search was conducted for the Debtors in Delaware and Connecticut and the results reflected liens in favor of McLane f/k/a Meadowbrook Meat Company, Inc., Merlin Business Bank, Pawnee Leasing Company and Stearns Bank which has a lien on C & L Store 7614 (collectively, "Non-Insider Secured Parties"). In addition, Herrman Li, an insider, has a security

interest in the each of the Debtors' assets. The claims asserted by the four entities can be described as follows:

    a. McLane f/k/a Meadowbrook Meat Company, Inc is the principal food supplier to the Debtors. It possesses a PACA claim and a reclamation claim;

    b. Stearns Bank provided a loan for tenant improvements at a single store;

    c. Pawnee Leasing Company's lien arises out of an equipment lease; and

    d. Merlin Business Bank loaned money for tenant improvements.

9. The search reflects valid and perfected liens against the Debtors in favor of McLane f/k/a Meadowbrook Meat Company, Inc., Stearns Bank (lien only on store 7614), Merlin Business Bank Pawnee Leasing Company and Herman Li. PNC Equipment Finance LLC ("PNC") was a creditor of the Debtors; however, the claim of PNC was sold to ADP Investments I LLC ("Investments"). Initially, PNC possessed a lien on the assets of the Debtors, however, either PNC or Investments failed to timely file a "continuation statement" and the lien has terminated. In 2020, an assignment of the UCC in favor of PNC was filed; however, only the assignment box was checked, and the continuation statement box was left unchecked.

10. Moreover, pursuant to a Forbearance Agreement executed in June of 2021 ("Forbearance Agreement") in exchange for payments of $2,000,000.00 and $3,000,000.00, respectively, Investments agreed to accept $25,000.00 in satisfaction of its debt if it did not receive consent from Denny's to become a franchisee on or before July 31, 2021. No consent was ever obtained. Issues related to the Forbearance Agreement are presently being litigated in United States District Court for the District of Delaware CA 1-22-cv- 00124-LPS.

11. The SBA also has claims against the Debtor arising out of Covid 19 EDIL loan program.

12.

13.     The Debtors are in the business of operating the Franchised Restaurants in the casual dining space.

14.     The reason the Debtors have had to file is the same reason that other franchise foods restaurants in the casual dining space have had to file. It is a mixture of shutdowns related to Covid 19, an increase in food and labor costs and the fact that the consumer is not visiting casual dining restaurants in the current economic environment. By way of example comparing 2019 to year-to-date 2022, revenue is down thirty-five percent (35%) and food and labor costs have increased by twenty percent (20%). The Debtors, to help offset the trend, have approached both their landlords and Denny's for relief. The request and the response have not been enough to prevent the Debtors from having to file their petitions for relief.

15.     Also contributing to the Debtors' financial issues are legal costs incurred defending wages and hours of litigation that are currently pending against the Debtors. An increase in fast food competition also added to the Debtors' financial issues.

### B.     Joint Administration

16.     The Debtors' have common ownership, have obligations to Denny's that contain cross default provisions and are jointly liable on the PNC debt. In addition, the Debtors are parties to a "credit card clearing contract" with Denny's that may impact the funds available to each Debtor. The Debtors have common ownership, and the Debtors may be jointly liable on claims possessed by certain EB 5 investors.

17.     Many of the motions, hearings, and orders that will arise in these cases will affect all the Debtors. Thus, the entry of an order directing the joint administration of the Subchapter V

cases will reduce administrative fees and costs by, for example, avoiding the necessity of filing duplicate motions and objections.

18. The Debtors are seeking only procedural, and not substantive, consolidation of their estates.

### C. Extension of Time to File Schedules and Statements of Financial Affairs

19. The Debtors have a limited staff who can work on the schedules that are required to be filed. In addition to the reporting duties occasioned by the Subchapter V filings, the Debtors and their accounting staff also must run and provide accounting support for the operating restaurants (both Debtors and non-Debtors).

20. The Debtors and Debtors' proposed counsel have been devoting substantial time and effort to organizing information necessary for the petitions and for preparation of numerous first day motions, and additional urgent motions are anticipated in the early stages of these cases.

21. Given the numerous other pleadings the Debtors are filing, and those they have yet to file, and compliance requirements of Office of the U.S. Trustee, the Debtors need additional time to complete and file their Schedules of Assets and Liabilities (the "Schedules"), Statements of Financial Affairs (the "SOFAs"), and any other documents required to be filed pursuant to any Case Management Deficiency Notices or other similar notices issued by the Court (collectively with the Schedules and SOFAs, the "Required Documents").

22. The Debtors do not believe that the extension of time materially prejudices the rights of any party. On balance, affording the Debtors sufficient time to file the Required Documents will likely alleviate the necessity of future amendments, and hopefully avoid additional expenditure of unnecessary administrative expenses incurred in connection with same.

23. To prepare the Required Documents, the Debtors must compile information from books, records, and documents relating to the claims of the Debtors' numerous creditors, as well as the Debtors' many assets and contracts. This information is extensive, and collecting it requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals.

24. Since the filing of their petitions, the Debtors have been working toward complying with their various bankruptcy related obligations and those mandated by the SubV Trustee.

25. The need for the requested extension is not the result of a lack of due diligence on the part of the Debtors or their proposed counsel.

26. The Debtors are working diligently to prepare the Required Documents. However, due to the amount of work necessary to complete the Required Documents, and the time needed to assist in other matters critical to the Debtors' reorganization efforts, the Debtors require additional time beyond the required fourteen (14) day period to complete the Required Documents properly and accurately. The Debtors anticipate that they will need at least twenty-one (21) additional days to complete the Required Documents.

### D. **Cash Collateral**

27. The Debtors need to use "cash collateral" to operate their restaurants. The cost centers range from purchasing food and other goods, employee costs, garbage, light and power costs and other costs that are incurred daily to operate the restaurants. As outlined above, the applicable liens of record are in favor of McLane f/k/a Meadowbrook Meat Company, Inc, Stearns Bank (only store 7614), Merlin Business Bank and Pawnee Leasing Company, as well as Herman Li, an insider of the Debtors. Herman Li consents to the use of cash collateral.

28. The Debtors' ability to pay their employees and to otherwise maintain their day-to-day operations without disruptions is essential to the continued viability of the businesses and the Debtors' ability to reorganize. Hiring and retaining qualified employees have been particularly challenging during the pandemic, and the ability to continue to meet payroll on a timely basis is critical to the Debtors' ability to retain their workforce. The Debtors' need to use cash collateral is both critical and immediate, and, in the absence of authorization to use cash collateral, there will be serious and irreparable harm to the Debtors, their estates, their employees, and the Debtors' ability to reorganize.

29. The Debtors' use of cash collateral is necessary both to preserve the going concern value of the business and to reduce post-petition administrative expense claims against the Debtors, issues that are vitally important to a successful reorganization.

30. The Debtors have developed cash flow projections reflecting anticipated revenue and expenditures from the Petition Date over a thirteen-week period which are contained in proposed Interim Budgets (the "Interim Budgets," true and correct copies of which have been submitted with the Debtors' Cash Collateral Motion). As set forth in the Interim Budgets, the Debtors seek authority to use cash on hand as of the Petition Date together with funds generated from the post-petition operation of the Franchise Restaurants.

31. The Debtors have an immediate need for the use of asserted cash collateral to maintain their business operations. The Debtors' expected use of cash collateral during the interim period is reflected in the Interim Budgets. All payments described in the Interim Budgets are necessary to maintain and continue the Debtors' operations and to preserve their going concern value for the benefit of the Debtors' creditors. Significantly, the Debtors must remain current in their payments to Denny's under the Franchise Documents, as the loss of their franchise rights would

cause irreparable damage to the Secured Parties' collateral. Additionally, the Debtors must have access to cash collateral to make payments to their employees and vendors for post-petition goods and necessary services, including, among others, food and related supplies, rent, utilities, payroll, payroll tax, sales and other taxes, insurance, and other operating expenses and pertinent, ordinary expenses of its business. Failure to make payments in accordance with the Interim Budgets would likely result in the cessation or interruption of the Debtors' businesses, causing immediate and irreparable harm to their estates. Put simply, the Debtors cannot continue operations without the use of cash collateral, and if the Debtors are unable to operate, all parties will be harmed.

32. Although the Debtors do not concede or agree that all of the cash generated by the Franchise Restaurants is the cash collateral of the Non-Insider Secured Parties, the Debtors seek to use cash derived from the business operations on an interim basis, in accordance with the Interim Budgets. The Debtors further seek final use of cash collateral in accordance with the budget to be filed prior to the final hearing.

33. Inasmuch as the proposed expenditures are projections, there may be some variation in the categories of expenditures as well as unanticipated expenses, particularly on an interim basis. For example, it is not possible to predict at this time the effect, if any, that these Subchapter V filings may have on the Debtors' businesses in the short term, although little, if any, impact is anticipated. Therefore, on a monthly basis, the Debtors seek authority to exceed the aggregate amount of the Interim Budget by twenty percent (20%). Further, the Debtors request that they be authorized to apply any unused amount in one category for each month to any other category on a cumulative basis.

34. The Debtors' business is seasonal, and while cash revenues are currently at a low point, they are expected to increase during the holiday season and to rise month by month as

operations move into the spring and summer months. Accordingly, by continuing to operate in the normal course, the Debtors anticipate that their cash collateral position will only improve, thereby improving the Debtors' overall going concern values.

35. The Franchise Restaurants are the Debtors' primary assets, and without the continuity of operations and an uninterrupted ability to conduct business, the Debtors could face significant customer defection, which would have an immediate and devastating effect upon the Debtors' future revenues, creditors, employees, and opportunity for reorganization.

36. If the Debtors do not have access to cash to pay their operating expenses, even for a short amount of time, they will, in all likelihood, be forced to shut down, which would irreparably harm their fair value. As such, the use of cash collateral (including all cash existing on the Petition Date plus all post-petition revenue generated) to conduct the Debtors' business will not only preserve and protect the value of the Non-Insider Secured Parties' collateral generally – thus providing the Non-Insider Secured Parties with adequate protection of their interests – it will enhance and maximize the potential recovery for all creditors of the Debtors' estates.

### E. **Utilities**

37. Uninterrupted utility services during the reorganization are vital to operation of the Franchise Restaurants and preservation of the going concern value of the Debtors' businesses. In addition, implementation of orderly procedures for utility companies is essential to cash flow and vitally important to the success of the reorganization.

38. In connection with the operation of their businesses, the Debtors obtain water, sewer service, waste disposal, natural gas, electricity, telecommunications, internet access and service, and other similar services (collectively, the "Utility Services") from a number of utility providers (the "Utility Provider(s)"). A nonexclusive list of the Utility Providers and their affiliates

that provide Utility Services to the Debtors as of the Petition Date is attached to the Debtors' Utility Motion. The relief requested therein is requested with respect to all Utility Providers providing Utility Services to the Debtors, regardless of whether they are included in the Debtors' Utility Motion.

39. Preserving Utility Services on an uninterrupted basis is essential to the Debtors' business operations. The Debtors' businesses include multiple operating restaurant locations. These locations require electricity, telecommunications, internet, water, waste management, and other utility services to operate.

40. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted, which could jeopardize the Debtors' ability to effectively reorganize. Accordingly, it is essential that the Utility Services continue uninterrupted during these Bankruptcy Cases.

41. The Debtors intend to pay post-petition obligations to the Utility Providers in a substantially timely manner consistent with ordinary course practices.

### F. Employee Matters

42. The Debtors have filed *Debtors' Expedited Motion for Entry of an Order (i) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (ii) Granting Related Relief* (the "Wage Motion").

43. By way of the Wage Motion, the Debtors seek entry of an Order authorizing the Debtors to pay Employee Obligations, as defined in the Wage Motion, and directing Bank of America to honor any payments for the Employee Obligations.

44. The relief requested in the Wage Motion is necessary to avoid irreparable harm and is appropriate because operations of the Debtor are labor intensive and require the labor and services of their current employees in order for business operations to continue uninterrupted and to generate funds in support of the overall reorganization strategy. In summary, the Debtors' recent pay period ended on November 9th., 2022 for C & L Diners, LLC, November 2nd., 2022 for Pacific Restaurants, LLC and November 2nd., 2022 for C & L Hartford, LLC (the "Pre-Pay Period"), and all current employees are due their earned wages from that period.

45. Without satisfying the Employee Obligations (as defined in the Wage Motion), the Debtors may lose valuable employees, causing a detrimental interruption in the Debtors' operations. Furthermore, given the current economic conditions and health risks caused by the global COVID-19 pandemic, replacing employees at this time could be difficult if not impossible. Moreover, the failure to receive timely paychecks will result in extreme hardship to employees.

46. The relief sought in the Wage Motion is necessary to avoid irreparable harm, to allow continued operations, and to facilitate achieving the reorganizational goals of these Subchapter V cases.

47. Accordingly, the Debtors seek authorization to pay outstanding Employee Obligations as set forth in the Wage Motion, and to continue Employee Benefits and pay Employee Benefit Obligations as also set forth in the Wage Motion. The Debtors also seek authorization to continue the Miscellaneous Benefit Programs as to pay the Miscellaneous Benefit Obligations as set forth in the Wage Motion.

48. The Debtors' One Hundred and Thirty-Eight (138) full and part time employees perform a variety of critical functions, including management, administration, maintenance, finance and accounting, human resources, safety, security, procurement and preparation of food related items

for ultimate delivery to consumers, and other areas crucial to the Debtors' businesses. The employees are fundamental to the success of the Debtors' businesses and continued operations and, as a result, critical to these Subchapter V cases and the Debtors' reorganization efforts. The Debtors estimate that, as of the Petition Date, the aggregate amount of their unpaid Employee Obligations is approximately $54,000 for C & L Diners, LLC, $20,000 for Pacific Restaurants, LLC and $26,000 for C & L Hartford, LLC.

49.     The Debtors pay employees' salaries, wages and other compensation (including overtime pay) in exchange for services they provide (the "Compensation Obligations). As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid Compensation Obligations accrued prepetition related to the Pre-Pay Period totals.

50.     The Debtors are not seeking authority to pay to any individual any amount in prepetition Compensation Obligations that would exceed the statutory priority cap imposed by Section 507(a)(4) of the Bankruptcy Code.

51.     The Debtors use ADP LLC to administer payroll for employees and provide related payroll processing, payroll tax reporting, time entry systems, payment preparation, payroll transfer administration and other reporting and administrative services (the "Payroll Processing Obligations").

52.     As employers, the Debtors are required by law to withhold from certain employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Withholding Taxes") and to remit them to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Debtors are also required to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits),

additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Tax Obligations").

53. As of the Petition Date, the Debtors estimate that they owe approximately $13,200 for C & L Diners, LLC; $7,600 for Pacific Restaurants, LLC; and $8,500 for C & L Hartford, LLC in Payroll Tax Obligations relating to the prepetition period.

54. The Debtors also process child support garnishments owed by various Employees as part of the Employee Obligations. Accordingly, the Debtors seek authorization to process the Employees' Child Support Garnishments as part of the relief sought herein.

55. In addition to the aforementioned payment-related obligations, the Debtors maintain various employment benefit plans and policies for their employees, including health care, vision, dental, and other miscellaneous benefit programs (collectively, the "Employee Benefits", and the obligations related thereto, the "Employee Benefit Obligations"). Participation in the Employee Benefits is at the discretion of each individual employee and varies based on their participation therein.

56. Medical, dental, vision, and other health care benefits (collectively, the "Health Care Benefits") are available to eligible employees of the Debtors. The Health Care Benefits of employees' and the Debtors' contributions (the "Health Care Benefit Obligations") are set forth in the Wage Motion.

57. The Debtors also maintain additional Employee Benefits including, payment to employee's garnishments, disability insurances, life insurances, and telephone programs which are all funded entirely by "after-tax" employee contributions (collectively the "Miscellaneous Benefit

Programs"). The Debtors also seek authorization to continue to operate and administer the Miscellaneous Benefit Programs as part of the Employee Benefit Obligations.

58. The Miscellaneous Benefit Obligations are funded exclusively by employee contributions but are administered by the Debtors.

## CUSTOMER PRACTICES MOTION

59. The Debtors have filed a Customer Practices Motion to allow the Debtors to honor gift cards and discount coupons. If the Debtors do not honor either gift cards or discount coupons the Debtors will lose customer support and issues will exist throughout the Denny's system nationwide. Debtors' gift card exposure is less than $ 10,000.00 and the exposure on the discount coupons is unknown since most discount coupons are issued by Denny's on a national basis with some issued locally by the Debtors.

60. I declare, under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed on November 9, 2022 in Los Angeles, California.

_____
**Herman Li**

## **CERTIFICATE OF SERVICE**

  I hereby certify that on November 9, 2022 a copy of the foregoing was filed electronically and shall be served as required by L. Bankr. R. 9013-2(b) (together with any order entered upon the foregoing), with notice of this filing being sent by email to all Notice Parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties in interest may access this document through the court's CM/ECF System.

            */s/ Tara L. Trifon*
            Tara L. Trifon